Donald R. STACY et al., Plaintiffs,

v.

John D. WILLIAMS et al., Defendants.

Danny E. CUPIT et al., Plaintiffs,

v.

M. M. ROBERTS et al., Defendants.

Nos. WC 6725, 6837.

United States District Court
N. D. Mississippi, W. D.

Dec. 1, 1969.

J. Wesley Watkins, James L. Robertson, Eugene M. Bogen, Greenville, Miss., for plaintiffs.

Will S. Wells, Asst. Atty. Gen., Jackson, Miss., M. M. Roberts, Hattiesburg, Miss., for defendants.

Before COLEMAN, Circuit Judge, and RUSSELL and KEADY, District Judges.

KEADY, District Judge:

These consolidated cases [1] brought by students at the University of Mississippi and Mississippi State University, representing campus student organizations, by a faculty association, and by other persons, attack the constitutionality of regulations for off-campus speakers adopted by the Board of Trustees of the Institutions of Higher Learning of the State of Mississippi, and made applicable to all state colleges and universities under the Board's supervision. Plaintiffs seek both declaratory and injunctive relief against enforcement of these regulations.

On January 14, 1969, this three-judge United States District Court convened pursuant to 28 U.S.C. § 2281 [2] to determine the constitutionality vel non of the various speaker regulations [3] adopted be-

---

1. Cause No. WC 6725, filed June 30, 1967, was instituted by student members of the University of Mississippi's Chapter of the Young Democratic Clubs of Mississippi, Institute of Civics under National Defense Education Act, and University of Mississippi Chapter of American Association of University Professors, and they complained of denial of request for campus speech by Aaron Henry as guest lecturer at a special civics program. Cause No. WC 6837, filed October 2, 1968, was also instituted by student representatives of the University of Mississippi's Chapter of the Young Democratic Clubs of Mississippi, and they complained of denial of a request for campus speech by Charles Evers, in support of the Humphrey-Muskie Presidential ticket. On October 21, 1968, student members of the Mississippi State University Chapter of the Young Democratic Clubs of Mississippi filed their complaint in intervention in No. WC 6837-K, complaining of the Board's refusal to allow Charles Evers to speak on the State College campus in support of the national Democratic Party. Henry and Evers joined as co-plain-

tiffs in the respective actions. Temporary restraining orders, issued by a single judge, allowed Henry and Evers to fulfill their speaking engagements at the University of Mississippi campus, but such relief was declined to intervenors from Mississippi State University. The cases were then consolidated for trial.

2. In a Memorandum Opinion, yet unpublished, entered in *Stacy*, No. WC 6725, on December 28, 1967, United States Circuit Judge Claude F. Clayton, sitting by special designation as District Judge, held this a proper case for convening of a three-judge court as it seeks injunctive relief against enforcement of a state administrative regulation having state-wide application on the ground 'of unconstitutionality. Agreeing, we adopt that Opinion as our own to settle jurisdiction.

3. The several written regulations and amendments thereto are set forth by date of adoption, as follows:
*February 17, 1955*
"All speakers invited to the campus of any of the state institutions of higher

tween February 17, 1955, and February 15, 1968, and then enforced by the Board of Trustees of Mississippi's Institutions of Higher Learning. We considered them only on their face and as written, as alleged invidious, discriminatory application thereof would properly be a matter for a single district judge, and, except for the investigatory powers therein granted the Board and the various University heads, we found them unconstitutionally vague, facially, and issued a declaratory judgment accordingly pursuant to 28 U.S.C. § 2201. As demonstrated (see Fn. 3), the standards adopted by the Board for judging acceptability of invited speakers were invalid on their face for lack of objective measurement, thus falling "within the compass of those decisions of the [Supreme] Court holding that a law forbidding or requiring conduct in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates due process of law." Baggett v. Bullitt, 377 U.S. 360, 367, 84 S.Ct. 1316, 1320, 12 L.Ed.2d 377, 382 (1964).[4] Acting in the belief that the Board and the university administrators would not attempt to enforce regulations declared invalid by this court, we postponed granting injunctive relief for a sixty-day period, during which time the Board was permitted to propose new regulations, if it so desired, consonant with the ruling of the court.[5]

learning must first be investigated and approved by the head of the institution involved and when invited the names of such speakers must be filed with the Executive Secretary of the Board of Trustees."

*November 17, 1966*

"Henceforth names of anticipated visiting speakers at the several institutions of higher learning shall be furnished in advance of release of invitation not only to the Executive Secretary as heretofore but also to each member of the Board; and the executive heads of the several institutions will be charged with the responsibility of not approving invitations for *speakers who will do violence to the academic atmosphere* of the respective institutions; and *persons in disrepute in the area from whence they come,* and those *charged with crime or other moral wrongs* shall not be invited; and there will be no invitation to any person *who advocates a philosophy of the overthrow of the government of the United States.*"

*November 21, 1968*

This regulation amended those of February 17, 1955, and November 17, 1966, by prohibiting invitations to, in addition to those earlier banned, "any person *who has been announced as a political candidate or any person who wishes to speak on behalf of a political candidate.*"

*October 22, 1964*

"In general it shall be the policy of the several institutions not to make available the buildings and other facilities of the institutions to outside organizations. Exceptions to this policy may be approved by the executive head of an institution. No exception shall be approved for commercial enterprises, *political or sectarian meetings,* without specific approval of the Board."

*February 15, 1968*

"The Board will allow *no more sectarian or political meetings* to be held on the campuses of the state-supported institutions conducted *by organizations outside the college complex.*" (Emphasis added)

Plaintiffs further complained of an unwritten regulation which, like the amendment of November 28, 1968, banned political candidates and their spokesmen. The portions emphasized above obviously must be, and are, condemned under the void-for-vagueness doctrine.

4. See also: Connally v. General Construction Co., 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926); Lanzetta v. New Jersey, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939).

University or college regulations analogous to those in this case were voided for facial unconstitutionality because of vagueness in Dickson v. Sitterson, 280 F.Supp. 486 (M.D.N.C.1968), three-judge court; Snyder v. Board of Trustees of the University of Illinois, 286 F.Supp. 927 (N.D.Ill.1968), three-judge court; Smith v. University of Tennessee, 300 F. Supp. 777 (E.D.Tenn.1969). Cf. Brooks v. Auburn University, 296 F.Supp. 188 (M.D.Ala.1969), aff'd 412 F.2d 1171 (5 Cir.1969), which involved vagueness in administrative decisions taken without rule or regulation.

5. We also provided that if the Board failed to propose new regulations within the time period specified, the injunctive relief prayed for would be granted as a matter

New regulations adopted by the Board on February 20, 1969, were submitted to this court on March 10, and plaintiffs thereafter filed timely objections. In all essential parts, we find the second set of regulations either invalid for vagueness under the Due Process Clause, as were the former regulations, or in clear violation of the Free Speech and Assembly provisions of the first and fourteenth amendments as well as the Equal Protection Clause of the fourteenth amendment. At the outset, it should be emphasized that this court is unwilling to interfere in any manner with the operation of the state's educational institutions except where, and only to the extent that, the Constitution requires it. We perceive no obstacle of constitutional concern under authoritative federal decisions which precludes a state or its agents from effectively controlling an orderly operation of its educational institutions. Indeed, college officials possess the authority, and have the duty, to make and enforce reasonable rules applicable to students, faculty and campus invitees alike to insure "the maintenance of order and decorum within the educational system." Burnside v. Byars, 363 F.2d 744 (5 Cir. 1966).[6] For their part college students can have no valid objection to proper rules governing their conduct as members of the academic community.[7]

Before dealing seriatim with the Board's new regulations, we first examine those controlling constitutional principles that relate directly to the issue of where, in the sensitive area of speech control, the university's power ends and students' rights begin.[8] That question, which is here presented, is one of immense public concern, and rightly so.

We begin with the premise that the facilities of state colleges and universities, dedicated as they are to the specialized function of education, may be utilized solely for that purpose. "The

---

of course. Attorneys representing the Board stated, at the hearing, that they very much desired an opportunity to propose new Board regulations.

6. Accord, Blackwell v. Issaquena Board of Education, 363 F.2d 749 (5 Cir. 1966): "There was an unusual degree of commotion, boisterous conduct, a collision with the rights of others, an undermining of authority, and a lack of order, discipline and decorum. * * * The school authorities in the instant case had a legitimate and substantial interest in the orderly conduct of the school and a duty to protect such substantial interests in the school's operation." Also Ferrell v. Dallas Independent School District, 392 F. 2d 697 (5 Cir. 1968).

7. We extend our hearty endorsement to the following statement made by the United States District Judges for the Western District of Missouri, sitting en banc, on the subject of "Obligations of a Student" in General Order on Judicial Standards of Procedure and Substance in Review of Student Discipline in Tax Supported Institutions of Higher Education, 45 F.R.D. 133, at 141:
"Attendance at a tax supported educational institution of higher learning is not compulsory. The federal constitution protects the equality of opportunity of all qualified persons to attend. Whether this protected opportunity be called a qualified 'right' or 'privilege' is unimportant. It is optional and voluntary.
"The voluntary attendance of a student in such institutions is a voluntary entrance into the academic community. By such voluntary entrance, the student voluntarily assumes obligations of performance and behavior reasonably imposed by the institution of choice relevant to its lawful missions, processes, and functions. These obligations are generally much higher than those imposed on all citizens by the civil and criminal law. So long as there is no invidious discrimination, no deprivation of due process, no abridgement of a right protected in the circumstances, and no capricious, clearly unreasonable or unlawful action employed, the institution may discipline students to secure compliance with these higher obligations as a teaching method or to sever the student from the academic community.
"No student may, without liability to lawful discipline, intentionally act to impair or prevent, the accomplishment of any lawful mission, process, or function of an educational institution."

8. We perceive no difference between the constitutional rights of students and their teachers.

State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." Adderly v. State of Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966).[9]

▪ Thus, the freedoms of speech and assembly, while occupying a "preferred position" among constitutional liberties, may not be exercised on public property without regard to its primary usage. Moreover, wherever the policy is to allow outside speakers not connected with the university, it does not follow that the freedoms of speech and assembly of those persons on campus—students and faculty alike—may be exercised by anyone, at any time or place and regardless of the circumstances or probable consequences of the event. Snyder v. Board of Trustees of the University of Illinois, supra Fn. 4. See concurring opinion of Circuit Judge Godbold, in Ferrell v. Dallas Independent School District.[10] Just as the rights of students in this regard are not absolute, neither is the power of the Board, upon consent to outside speakers, so unfettered that it can be exercised in censorship over what is and what is not acceptable or in other arbitrary fashion.[11]

▪ The interest of both students and Board can, and must, yield to harmonious accommodation under the Constitution. In this case, the Board has not adopted an all-inclusive ban, but rather has sought to provide some oppor-

---

9. The only decision we find raising any doubt as to this proposition is Buckley v. Meng, 35 Misc.2d 467, 230 N.Y.S. 2d 924, 933 (1962), wherein it was observed that:
 "The overriding issue as to use of school facilities for non-academic purposes is not raised. Thus, while there may be no duty to open the doors of the school houses for uses other than academic—and I have some doubt even as to this proposition—once they are opened they must be opened under conditions consistent with constitutional principle[s]."
 Plaintiffs in the instant case do not take issue with the power of the Board "to constitutionally limit the use of college facilities by forbidding *all* outside speakers to appear on campus and restrict campus facilities exclusively for use by immediate members of the university community." Plaintiffs' brief dated December 18, 1968, p. 21.

10. 392 F.2d at 704:
 "But in measuring the appropriateness and reasonableness of school regulations against the constitutional protections of the First and Fourteenth Amendments the courts must give full credence to the role and purposes of the schools and of the tools with which it is expected that they deal with their problems, and careful recognition to the differences between what are reasonable restraints in the classroom and what are reasonable restraints on the street corner."

11. The clearest statement on the subject may be found in Danskin v. San Diego Unified School Dist., 28 Cal.2d 536, 545–546, 171 P.2d 885 (1946):
 "Once it [the State] opens the doors, however, it cannot demand tickets of admission in the form of convictions and affiliations that it deems acceptable.
 * * * * *
 "It is not for the state to control the influence of a public forum by censoring the ideas, the proponents, or the audience; if it could, that freedom which is the life of democratic assembly would be stilled. And the dulling effects of censorship on a community are more to be feared than the quickening influence of a live interchange of ideas."
 Circuit Judge Griffin Bell, in Brooks v. Auburn University, supra, observed:
 "[I]t nevertheless is clear under the prior restraint doctrine that the right of the faculty and students to hear a speaker, selected as was the speaker here, cannot be left to the discretion of the university president on a pick and choose basis."
 Compare the reasoning of the Supreme Court in Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 [invalidating a Louisiana statute held to vest broad discretion in state officials to deny picketing except where conducted by a labor organization], holding:
 "It is clearly unconstitutional to enable a public official to determine which expressions of view will be permitted and which will not or to engage in invidious discrimination among persons or groups either by use of a statute providing a system of broad discretionary licensing power or, as in this case, the equivalent of such a system by selective enforcement of an extremely broad prohibitory statute."

tunity, albeit limited, for students at the various institutions to hear guest speakers. For this nonexclusionary attitude it is to be commended, but as it opens the lecture halls it must do so nondiscriminatorily. College administrators, in drafting a rule to *regulate speaking,* must give primary consideration to students' rights entitled to "comprehensive protection under the first amendment."[12] Utmost care must be shown for the recognition of those rights, particularly since a regulation of this type undertakes to bar certain speech and thus becomes a limitation upon freedom of speech and assembly.[13] Indeed, speaker regulations, *by their very nature,* constitute "prior restraints" upon the freedoms of speech and assembly. Although the law presumes their invalidity,[14] prior restraints are not unconstitutional per se. Near v. Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). But, in order to withstand constitutional attack, prior restraints must be narrowly drafted so as to suppress only that speech which presents a "clear and present danger" of resulting in serious substantive evil which a university has the right to prevent. Schenck v. United States, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919); Cantwell v. Connecticut, 310 U.S. 296,

311, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1950). In *Dennis,* the Supreme Court made an exhaustive review of all of the cases involving application of the clear and present danger test for suppressing speech and concluded by adopting Chief Judge Learned Hand's interpretation of the phrase: "In each case, [Courts] must ask whether the gravity of the 'evil,' discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger." (United States v. Dennis, 2 Cir., 183 F.2d 201, at p. 212). Obviously the evils sought to be avoided and their seriousness are to be judged within the context of each case, here, the peaceful functioning of institutions of higher learning.[15] Although the priority given first amendment rights makes for a "sanctity and a sanction not permitting dubious intrusions", Thomas v. Collins, 323 U.S. 516, 530, 65 S.Ct. 315, 322, 89 L.Ed. 430, 440 (1945), it is equally true that students' activity, whether manifested by a guest speaker or other mode of expression, which "materially disrupts classroom work or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guaranty of freedom of

12. As held by the United States Supreme Court in Tinker v. Des Moines Community School Dist., 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731, 737 (1969):
"First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students. It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate. This has been the unmistakable holding of this Court for almost 50 years."
Plaintiffs, representing student and faculty associations, have, without question, standing to attack the Board's regulations which abridge their first amendment rights.

13. The first amendment provisions that "Congress shall make no law * * * abridging the freedom of speech * * * or the right of the people peaceably to assemble * * *," have long been in-

corporated into the fourteenth amendment so as to apply to the state's public educational institutions as an aspect of substantive due process. Gitlow v. People of State of New York, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925); West Virginia Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943).

14. See, e. g., Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed. 2d 584 (1963); Lovell v. City of Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938).

15. The "clear and present danger rule" is not a mechanical test applicable in every case touching first amendment freedoms, without regard to the context of its application; it is the considerations that gave birth to the rule, not the phrase itself, that are vital. American Communications Association v. Douds, 339 U.S. 382, 70 S.Ct. 674, 94 L.Ed. 925 (1949).

speech." Tinker v. Des Moines Community School District, supra.[16]

To satisfy the clear and present danger test, there must be a finding by proper authority "either that immediate serious violence [or other substantive evil] was to be expected or was advocated, or that the past conduct furnished reason to believe that such advocacy was then contemplated", wrote Mr. Justice Brandeis, in concurring opinion, in Whitney v. California, 274 U.S. 357, 376, 47 S.Ct. 641, 648, 71 L.Ed. 1095, 1106 (1927).[17] This guide was followed by Mr. Justice Black in Bridges v. California, 314 U.S. 252, 263, 62 S.Ct. 190, 194, 86 L.Ed. 192, 203 (1941), by stating it to be "a working principle that the substantive evil must be extremely serious and the degree of imminence extremely high" before utterances can be proscribed.[18] Also, there must be recognized the material difference between speech which agitates and exhorts, calling for present violent action creating clear and present danger of serious substantive evil, which may assuredly be prohibited, and speech which is mere doctrinal justification of a thought or idea, leaving an "opportunity for general discussion and the calm process of thought and reason", which cannot be prohibited.[19] This last principle was recently reiterated by the Supreme Court when it declared that "a statute which fails to draw this distinction impermissibly intrudes upon the freedoms guaranteed by the First and Fourteenth Amendments", and "it sweeps within its condemnation speech which our Constitution has immunized from governmental control".[20]

■■ Within the framework of the foregoing constitutional principles, we hold speaker regulations may validly provide that no request for a speaker will be honored unless made to the university by a recognized student or faculty group[21] within a reasonable period of

---

16. The Supreme Court's majority opinion, authored by Mr. Justice Fortas, cited with approval the aforementioned Fifth Circuit cases of Burnside v. Byars and Blackwell v. Issaquena Board of Education.

17. In *Whitney*, supra, Mr. Justice Brandeis also said:

"Fear of serious injury cannot alone justify suppression of free speech and assembly. Men feared witches and burned women. It is the function of speech to free men from the bondage of irrational fears. *To justify suppression of free speech there must be reasonable ground to fear that serious evil will result if free speech is practiced. There must be reasonable ground to believe that the danger apprehended is imminent. There must be reasonable ground to believe that the evil to be prevented is a serious one.* * * But even advocacy of violation [of law], however reprehensible morally, is not a justification for denying free speech where the advocacy falls short of incitement and there is nothing to indicate that the advocacy would be immediately acted on. The wide difference between advocacy and incitement, between preparation and attempt, between assembling and conspiracy, must be borne in mind." (Emphasis added)

18. It is worthy of note that Justices Black and Douglas now question the propriety of the clear and present danger doctrine in the interpretation of the first amendment. See their separate concurring opinions in Brandenburg v. Ohio, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430, decided June 9, 1969.

19. Schneiderman v. United States, 320 U.S. 118, 157, 63 S.Ct. 1333, 87 L.Ed. 1796, 1819 (1943); Noto v. United States, 81 S.Ct. 1517, 367 U.S. 290, 6 L.Ed.2d 836 (1961).

20. Brandenburg v. Ohio, supra. The Supreme Court also said, in reference to Dennis v. United States and like decisions, that:

"These later decisions have fashioned the principle that the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action."

21. In this case we do not reach the issue of whether the privilege of an individual faculty member, asserted as part of the right of academic freedom to teach, to invite an outside speaker to address his own class, is exempt from any regulation by university authorities.

time prior to the proposed speaking engagement, setting forth the name of the requesting student organization, the proposed date, time and location of the meeting, the expected size of the audience and topic of speech. Requirements such as these clearly relate to legitimate housekeeping needs of the institution, both to provide a suitable forum for the invited speaker and to allow orderly scheduling of facilities and avoidance of conflict with academic functions. Avins v. Rutgers, State University of New Jersey, 385 F.2d 151 (3 Cir. 1967); [22] Snyder v. Board of Trustees of University of Illinois, supra; Brooks v. Auburn University (District Court Opinion), supra. Moreover, it may be provided that an invitation shall not issue to a guest speaker unless approved by the executive head of the educational institution or such person or committee as he may authorize to act in his stead. It necessarily follows, however, that the approving authority must act in accordance with correctly prescribed standards; he must act upon a request within ample time after submission, and prompt review of his decision must be afforded. It is essential that procedural due process be built into such a regulation, in order for it to be valid, so as to relieve against the possibility of censorship, arbitrary decision, or unbridled discretion. For adequacy of standards for procedural due process, see Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965); Teitel Film Corp. v. Cusack, 390 U.S. 139, 88 S.Ct. 754, 19 L.Ed.2d 966 (1968); and for the necessity to avoid vesting unbridled discretion in the person or persons determining who may speak, see Kunz v. New York, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951).

The crux of a valid regulation must, in objective language, preclude only that speech subject to being forbidden under the doctrine of clear and present danger. For purpose of illustration, we have no doubt that the college or university authority may deny an invitation to a guest speaker requested by a campus group if it reasonably appears that such person would, in the course of his speech, advocate: 1) violent overthrow of the government of the United States, the State of Mississippi, or any political subdivision thereof; 2) willful destruction or seizure of the institution's buildings or other property; 3) disruption or impairment, by force, of the institution's regularly scheduled classes or other educational functions; 4) physical harm, coercion, intimidation or other invasion of lawful rights of the institution's officials, faculty members or students; or 5) other campus disorder of violent nature.[23] In drafting a regulation so providing, it must be made clear that the "advocacy" prohibited must be of the kind which prepares the group addressed for imminent action and steels it to such action, as opposed to the abstract espousal of the moral propriety of a course of action by resort to force; and there must be not only advocacy to action but also a reasonable apprehension of imminent danger to the essential functions and purposes of the institution, including the safety of its property and the protection

---

22. Avins v. Rutgers, supra, 385 F.2d at 153:
 "The right to freedom of speech does not open every avenue to one who desires to use a particular outlet for expression. On the contrary, each particular avenue for expression presents its own peculiar problems. * * * Nor does freedom of speech comprehend the right to speak on any subject at any time."

23. This is a considered enumeration of the categories of serious substantive evil which a college or university has an unmistakable right to guard against. We do not exclude other types of speech, equally subject to constitutional suppression, provided they qualify upon the basis of clear and present danger and satisfy requirements made rigid in these words: "Only the gravest abuses, endangering paramount interests, give occasion for permissible limitation. It is therefore in our tradition to allow the widest room for discussion, the narrowest range for its restriction, particularly when this right is exercised in conjunction with peaceable assembly." Thomas v. Collins, supra, 323 U.S. at 530, 65 S.Ct. at 323.

of its officials, faculty members and students. (See Fn. 19 and 20). For emphasis, we repeat that a regulation may validly vest in the university's approving authority the power of deciding whether to invite a particular speaker requested by students, but it is a power to be exercised in good faith and upon relevant inquiry, consistent with the narrowed scope of what the regulation may constitutionally forbid, and also subject to adequate review procedure in event speech is forbidden.

Finally, we see no objection to the university's requirement that preference be given to an academic event over an invitation to a guest speaker sought to be scheduled for the same time. It may also require that the speaker assume full responsibility for any violation of law caused by his own conduct, and demand that a statement be made at the meeting that the views presented by the speaker are not necessarily those of the institution or of the sponsoring group. It is unnecessary to state that the university's power to maintain order at any campus meeting remains uninhibited.

Having in mind powers which may lawfully be exercised by the Board and the various university heads, we now examine the second set of regulations proposed by defendants.

## REGULATIONS I AND II

The filing requirements contained in these regulations [24] are constitutionally acceptable as reasonable "housekeeping rules" necessary to avoid conflicts in the scheduling of facilities, to afford adequate security measures, etc., and to that extent would be approved. The head of an institution may be granted investigatory power with respect to a proposed speaker in order that he may adequately discharge his discretionary duty, in accordance with objectively stated and ascertainable standards provided by the regulation, and in no way do we suggest that the executive head may possess unbridled discretion in "approving", or determining who may speak.[25] However, to be valid, there must be added thereto provisions that the university head's decision be subject to fair and adequate review within a reasonable time, and that the executive head and reviewing board must act on the request within a specified reasonable time, or the request shall be deemed granted. See Freedman v. Maryland, supra. The regulations also fail to provide expressly that requests for speaker invitations may be initiated by the students themselves. This would be constitutionally required in order to avoid an outright stifling of constitutionally protected rights of freedom of speech and assembly. The university may not give to its administration the power to invite outside speakers and at the same time withhold the opportunity from student groups to make similar invitations. In opening its doors, the university may not, at will, pick and choose in the matter of inviting outside speakers. See Fn. 11.

## REGULATION III

Despite the Board's clarification of who is a "candidate" for public office, this particular regulation [26] is yet

---

24. I. No speaker shall be invited or permitted to speak on any campus of the state institutions of higher learning without first having been investigated and approved by the head of the institution involved, and the name of such proposed speaker must be submitted to the Executive Secretary and to all members of the Board of Trustees of Institutions of Higher Learning, and shall remain on file with the Executive Secretary of said Board of Trustees for a period of ten days before the approval may be had.

II. An invitation to speak on the campus of any state institution of higher learning shall be extended in writing only by the head of the institution or by the head or dean of a school or department thereof with the written authorization of the head of said institution.

25. Kunz v. New York, supra; Brooks v. Auburn University (Court of Appeals Opinion), supra.

26. III. No person shall be permitted to speak or make speeches on any campus

constitutionally infirm. We are not here concerned with the asserted right of an uninvited candidate for public office to mount his soap box on a university campus in support of his own cause— indeed, it is highly questionable that any such right exists—but we deal with an entirely independent and altogether more fundamental matter, namely: the right of the campus community, students and faculty alike, to hear and participate in political discussions, including the advocacy of a particular candidate for public office. Obviously, speakers of this type, subject to few exceptions, may not be prohibited under the clear and present danger test. We need not pause to consider whether all, or only the great majority of candidates, seek audience approval and in no way pose a threat of campus disorder. Suffice it to say that any classification which bans political speeches is arbitrary and unreasonable and was unequivocally condemned by the Supreme Court in Mills v. Alabama, 384 U.S. 214, 86 S.Ct. 1434, 16 L.Ed.2d 484, 488 (1966), holding that political discussion must remain free and open, in these words:

"Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the

free discussion of governmental affairs. This of course includes discussion of candidates, structures and forms of government, the manner in which government is operated or should be operated, and all such matters relating to political processes." [27]

So long as the campus remains open to other outside speakers, it is patently clear that invited political candidates and their standard bearers, however specifically defined, may not, consistently either with the first amendment rights of the students or with the Equal Protection Clause of the fourteenth amendment, be barred except upon the clear and present danger criterion. This regulation is rejected in toto.

### REGULATION IV

There should be little question, if any, that a university is not constitutionally compelled to permit outside religious groups to conduct public worship services on the campus. There is doubt arising from the vagueness of the language used whether an outside speaker may speak to students, along with others, on a religious topic. But as this regulation [28] can reasonably be construed to mean that no student religious group may invite outside speakers on religious topics, which prohibition would conflict with the Equal Protection Clause, it

of any state controlled institution of higher learning in Mississippi who has announced as a political candidate for public office; and no person may speak on behalf of such announced political candidate or candidates or use on-campus buildings or facilities of any of the state owned and controlled institutions of higher learning under the jurisdiction of the Board of Trustees of Institutions of Higher Learning in Mississippi. An announced candidate is defined as a person who has formally qualified as a candidate under the laws of the state from which he comes or who has received nomination by the political party with which he is affiliated and under the banner of which he runs as such political candidate.

27. Chief Justice Hughes, in speaking for the Court in DeJonge v. Oregon, 299 U.S. 353, 365, 57 S.Ct. 255, 260, 81 L.Ed. 278, 284 (1937), declared:

"The greater the importance of safeguarding the community from incitements to the overthrow of our institutions by force and violence, the more imperative is the need to preserve inviolate the constitutional rights of free speech, free press and free assembly in order to maintain the opportunity for free political discussion, to the end that government may be responsive to the will of the people and that changes, if desired, may be obtained by peaceful means. Therein lies the security of the Republic, the very foundation of constitutional government."

28. IV. The buildings and facilities of state institutions of higher learning in Mississippi under the supervision of the Board of Trustees of such institutions shall not be made available for public religious meetings or gatherings to off campus persons or groups of persons.

must be rejected, and, if revised, must specifically be confined to forbidding only religious services conducted on the campus by persons having no connection with the university.

## REGULATION V

 Initially, this new regulation,[29] in barring all persons "convicted of a felony or other crime in the State of Mississippi or the United States involving moral turpitude or breach of the peace" is fraught with facial unconstitutionality for its language is "not open to one or a few interpretations, but to an indefinite number", Baggett v. Bullitt, supra. See Fn. 4. More importantly, even if the regulation contained constitutionally acceptable phraseology, it is not directed at all to advocacy. Moreover, it places conclusive weight upon but *one factor*, viz: a speaker's prior criminal record, to the exclusion of more substantial and legitimate considerations which should be weighed in correct application of the "clear and present danger" rule. Finally, this regulation ignores whether the evil sought to be avoided is insignificant and minor, which may not be ground for suppressing speech, or is serious and substantial so as to justify suppression.

29. V. No person who has been convicted of a felony or other crime in the State of Mississippi or the United States involving moral turpitude or breach of the peace will be invited to speak or permitted to speak on any campus of any of the state institutions of higher learning in Mississippi.

30. VI. No person shall be invited or permitted to speak on the campus of any of the state institutions of higher learning in Mississippi who has willfully damaged property of any institution of higher learning in the State of Mississippi or who has disrupted any institution of higher learning in the State of Mississippi by willful acts which resulted in violence and destruction of property owned by the State of Mississippi with adjudications relating thereto by a court or courts of competent jurisdiction within the last fifteen years.

## REGULATION VI

 First, while one's prior conduct on a college campus may certainly be a valid consideration in the "clear and present danger" test, it should not be determinative, especially where the act which is the basis of the ban occurred as many as fifteen years prior to issuance of the invitation. Stated more simply, this regulation [30] may not stand, for, in addition to its void-for-vagueness infirmities and other deficiencies mentioned with respect to Regulation V, it would bar one who, on a single occasion within the last fifteen years, committed or incited violence on a university campus, without any regard whatsoever for his presently held views and the subject matter of his proposed speech. An approach of this nature, reflected in several of the Board's new regulations, entirely misses the mark of permissible limitations. See this opinion, ante pp. 971 and 972.

## REGULATION VII

 This proposed regulation [31] poses only one major constitutional difficulty and that is its provision that one may be barred from the campus because his mere "presence" presents a clear and present danger of causing a riot thereon.[32] This is a misconception of the

31. VII. No person shall be permitted to use the facilities of the state institutions of higher learning *whose presence* will constitute a clear and present danger of inciting a riot on any campus thereof. Factors to be considered in determining whether a person's presence will constitute a clear and present danger include whether that person has in the past promoted or incited a riot resulting in the destruction of state owned property at any of said institutions or has disrupted the classroom activities existing at any of said institutions to the extent that classes had to be suspended with substantial interference with or total disruption of the teaching processes. (Emphasis added)

32. Such a test might well preclude speeches on many of the nation's college campuses by high government officials and military leaders who advocate a "hard line" in dealing with North Vietnam, contrary to

applicable doctrine for it is fundamental that one may not be barred from speaking merely because his presence alone provokes riotous conduct among the audience. One simply cannot be restrained from speaking, and his audience cannot be prevented from hearing him, unless the feared result is likely to be engendered by what the speaker himself says or does. In such circumstances envisioned by this proposed regulation, attendant law enforcement officers must quell the mob, not the speaker. See, e. g., Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958); Buchanan v. Warley, 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149 (1917). That the speaker may hold views disliked by the campus community is not a permissible basis for denial of the students' right to hear him. Terminiello v. Chicago, 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131, 1134 (1949).[33]

## REGULATION VIII

■ This regulation [34] is repetitive of number five, except that it omits breach of the peace violations, and is vulnerable to the same constitutional criticisms.

## REGULATION IX

■ This regulation [35] is defective in that it bars one who "advocates" violent overthrow of the government without differentiating between "the mere abstract teaching of * * * the moral propriety or even moral necessity for a resort to force and violence * * [and] preparing a group for violent action and steeling it to such action." Noto v. United States, supra, 367 U.S. at 297–298, 81 S.Ct. at 1521, 6 L.Ed.2d at 841. "The essential distinction is that those to whom the advocacy is addressed must be urged to do something, now or in the future, rather than merely to *believe* in something." (Emphasis original). Yates v. United States, 354 U.S. 298 at 325, 77 S.Ct. 1064 at 1080, 1 L.Ed.2d 1356 at 1378.

Not only must there be advocacy to action, there must also be a reasonable apprehension of imminent danger to organized government. See, e. g., Herndon v. Lowry, 301 U.S. 242, 57 S.Ct. 732, 81 L.Ed. 1066 (1937); and Brandenburg v. Ohio, supra.

## REGULATION X

■ This regulation [36] fails to make the constitutionally required distinction

the sentiment of great masses of today's college youth. The corrective, of course, is to discipline unruly, misbehaving students, but not curtail discussion of controversial government policy.

33. Terminiello v. Chicago, supra, at page 4, 69 S.Ct. at p. 896:

"Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech, though not absolute [citing cases], is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest. [citing cases] There is no room under our Constitution for a more restrictive view. For the alternative would lead to standardization of ideas either by legislatures, courts, or dominant political or community groups."

34. VIII. No person shall be permitted to use the facilities of the state institutions of higher learning who has been convicted of any crime involving violence or moral turpitude within a period of fifteen (15) years immediately prior hereto.

35. IX. No person shall be invited or permitted to speak on the campus of any of the state institutions of higher learning in Mississippi who advocates the violent overthrow of the Government of either the United States of America or the State of Mississippi.

36. X. No person shall be invited or permitted to speak on the campus of any of the state institutions of higher learning in Mississippi who has advocated violence or who has caused violence to be used by others which has actually resulted in the destruction of public property within a period of fifteen years prior to the date of invitation.

expressed in Number IX. It is also objectionable for the same reasons as Regulations V and VI.

## REGULATION XI

■ Here [37] the college administrator is given unlimited discretion to determine not only whether one has "provoked or incited a riot"—exceedingly vague terminology in itself—but also whether the purpose of such riot was "to * * * require a * * * university head to be ousted," and without more specific guidance he cannot be expected to do so in a constitutionally consistent manner. This regulation is further subject to same constitutional objections as Regulations V and VIII.

## REGULATION XII

■ Even assuming arguendo the validity of the foregoing regulations, this one [38] smacks of "guilt by association", see United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967), and, therefore, may not stand.

## REGULATION XIII

■ As earlier noted, aggrieved persons must be afforded prompt review of an adverse decision,[39] which should be conducted within a reasonable time prior to the proposed speaking engagement. They may not be required to await the next regularly scheduled Board meeting, for fundamental constitutional liberties may well be lost or substantially diluted by such delay. See Snyder v. Board of Trustees of University of Illinois, supra. The importance of adequate, efficient review, to satisfy procedural due process, is basic to any regulation otherwise valid on its face.

■ This brings us to the conclusion that, although the Board has rule-making power to regulate guest speakers that may be constitutionally exercised, it has yet failed to act in a valid manner. The Board having evinced strong desire to have suitable regulations, we are unwilling to strike down what it has done and leave the state's institutions of higher learning entirely without protection afforded by reasonable and valid rules. Therefore, we deem it appropriate for us, sitting as a court of equity, to grant relief to the parties by fashioning approved speaker regulations to be uniformly applied to the state's institutions of higher learning. The regulations promulgated by the court, which are attached as an appendix to this Opinion, are made effective upon the entry of our Decree and shall remain in force until repealed by the Board. The Board has the power of repeal since it is not *required* to have any regulation in this area; but in event of such repeal, the Board may not adopt any further regulation relat-

37. XI. No person shall be invited or permitted to appear on any campus of the state colleges or universities of Mississippi who has incited or provoked a riot in effort to cause or require a state college or university head to be ousted or his services terminated within a period of fifteen years prior to the date of such invitation; and in that connection and by way of explanation, those to be denied said privileges shall include any person who has, within a period of fifteen years, incited any group of more than three persons to enter a college or university campus or building and destroy property.

38. XII. The buildings and facilities of the state colleges and universities in Mississippi shall not be made available and are not available to any off-campus groups for public meetings or public gatherings, except when approval is first had and obtained from the Mississippi Board of Trustees of Institutions of Higher Learning; but no such off-campus group will be granted permission by said Board of Trustees for use of said buildings and facilities if it includes persons or groups prohibited in any of the foregoing regulations.

39. XIII. Any person or organization feeling aggrieved at any adverse ruling of the Chancellor or President of any Mississippi state institution of higher learning, as the case may be, may file an appeal within five days after such adverse ruling to said Board of Trustees of Institutions of Higher Learning for a hearing at their next succeeding regular Board meeting. Said notice will be filed with the Executive Secretary of the Board.

ing to guest speakers inconsistent with the views herein expressed.

Let decree be entered in accordance with this opinion.

## APPENDIX

## UNIFORM REGULATIONS FOR OFF-CAMPUS SPEAKERS INVITED BY ORGANIZED STUDENT AND FACULTY GROUPS APPLICABLE TO ALL INSTITUTIONS OF HIGHER LEARNING WITHIN THE STATE OF MISSISSIPPI

The freedoms of speech and assembly guaranteed by the first and fourteenth amendments to the United States Constitution shall be enjoyed by the students and faculties of the several Institutions of Higher Learning of the State of Mississippi as respects the opportunity to hear off-campus, or outside, speakers on the various campuses. Free discussion of subjects of either controversial or noncontroversial nature shall not be curtailed.

However, as there is no absolute right to assemble or to make or hear a speech at any time or place regardless of the circumstances, content of speech, purpose of assembly, or probable consequences of such meeting or speech, the issuance of invitations to outside speakers shall be limited in the following particulars, but only in the manner set forth herein:

(1) A request to invite an outside speaker will be considered only when made by an organized student or faculty group, recognized by the head of the college or university;

(2) No invitation by such organized group shall issue to an outside speaker without prior written concurrence by the head of the institution, or such person or committee as may be designated by him (hereafter referred to as his authorized designee), for scheduling of speaker dates and assignment of campus facilities;

(3) Any speaker request shall be made in writing by an officer of the student or faculty organization desiring to sponsor the proposed speaker not later than ten calendar days prior to the date of the proposed speaking engagement. This request shall contain the name of the sponsoring organization, the proposed date, time and location of the meeting, the expected size of the audience and topic of speech. Any request not acted upon by the head of the institution, or his authorized designee, within four days after submission shall be deemed granted;

(4) A request made by a recognized organization may be denied only if the head of the institution, or his authorized designee, determines, after proper inquiry, that the proposed speech will constitute a clear and present danger to the institution's orderly operation by the speaker's advocacy[1] of such actions as:

1. The violent overthrow of the government of the United States, the State of Mississippi, or any political subdivision thereof; or

2. The willful damage or destruction, or seizure and subversion, of the institution's buildings or other property; or

3. The forcible disruption or impairment of, or interference with, the institution's regularly scheduled classes or other educational functions; or

4. The physical harm, coercion, intimidation, or other invasion of lawful rights, of the institution's officials, faculty members or students; or

5. Other campus disorder of a violent nature.

In determining the existence of a clear and present danger, the head of the institution, or his authorized designee, may

---

[1]. Advocacy, as described above, means preparing the group addressed for imminent action and steeling it to such action, as opposed to the abstract espousal of the moral propriety of a course of action by resort to force; and there must be not only advocacy to action but also a reasonable apprehension of imminent danger to the essential functions and purposes of the institution.

980

consider all relevant factors, including whether such speaker has, within the past five years, incited violence resulting in the destruction of property at any state educational institution or has willfully caused the forcible disruption of regularly scheduled classes or other educational functions at any such institution.

(5) Where the request for an outside speaker is denied, any sponsoring organization thereby aggrieved shall, upon written application to the head of the institution, or his authorized designee, obtain a hearing within two days following the filing of its appeal before a Campus Review Committee, composed of three faculty members and two students of the institution, for a de novo consideration of the request. The Campus Review Committee shall have power to grant or deny the request; and its decision shall be final, unless judicial review is sought as hereinafter provided. If such request is neither granted nor denied within said two-day period, it shall be deemed granted, and the speaker's invitation shall issue. The three faculty members to serve on the Campus Review Committee shall be appointed at each institution for a one-year term beginning September 1 of each calendar year, and this appointment shall be made by the President of the Board of Trustees of the Institutions of Higher Learning. The two student members on the Campus Review Committee shall be the president and secretary of the student body of each institution, and they shall serve only as long as they hold those student offices.

Any sponsoring organization aggrieved by the action of the Campus Review Committee in denying the request may obtain judicial review thereof upon application to any court of competent jurisdiction, state or federal, by presenting its verified petition setting forth the grounds of complaint and giving adequate notice of such filing to the head of the institution. Upon a hearing to be conducted as soon as practicable, and at such time and place as the court may

prescribe, the court shall either reverse or affirm the decision of the Campus Review Committee as may be proper under the law and facts.

(6) Where the request for an outside speaker is granted and the speaker accepts the invitation, the sponsoring organization shall inform the head of the institution, or his authorized designee, in writing immediately of such acceptance. The head of the institution, or his authorized designee, may, in his discretion, require that the meeting be chaired by a member of the administration or faculty, and he may further require a statement to be made at the meeting that the views presented are not necessarily those of the institution or of the sponsoring group. By his acceptance of the invitation to speak, the speaker shall assume full responsibility for any violation of law committed by him while he is on campus.